NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 13a0273n.06

No. 10-1675

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Mar 19, 2013*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| JOSEPH J. LEONARD, | ) | |
| | ) | |
| Petitioner – Appellant, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | EASTERN DISTRICT OF MICHIGAN |
| BLAINE C. LAFLER, Warden, | ) | |
| | ) | OPINION |
| Respondent – Appellee. | ) | |
| | ) | |

Before: GIBBONS, KETHLEDGE, and STRANCH, Circuit Judges.

**JANE B. STRANCH**, Circuit Judge. Joseph J. Leonard, a Michigan inmate who was convicted at jury trial of assault with intent to kill Paula Primm, appeals the judgment of the district court denying his petition for a writ of habeas corpus under 28 U.S.C. § 2254. We AFFIRM.

## I. FACTS AND PROCEDURAL HISTORY

Primm testified at trial that Leonard rented a room in her home beginning in June 2003. A few weeks later, on August 22, Primm asked Leonard to move out of the house. He retreated to his bedroom and did not come out. Primm went to the bedroom to "hurry him up" and then returned to her chair in the living room. Leonard suddenly appeared, grabbed her by the hair, put her in a headlock, and dragged her to a bedroom in the back of the house while he repeatedly punched her face with his fist. Upon reaching the bedroom, Leonard knocked Primm down. She saw two butcher knives from her kitchen lying on the bed. Leonard bound her arms, legs, and head with masking tape

1

and repeatedly kicked her over the next two hours as she lay helpless on the floor. Primm suffered severe injuries to her face, including the loss of eight teeth. Leonard broke Primm's arm that she had recently injured and he also used a knife to inflict minor cuts on her neck and near her eye. Leonard threatened to kill Primm because she could identify him and he did not want to return to jail. Primm did not expect to leave the room alive.

Primm's friend, Barry Harms, stopped by the home. He thought it odd that Primm did not answer the front door because there were signs she was home. As he walked around the house to the back door, he heard Primm screaming. Harms could not open the back door because an object had been jammed beneath the door handle. Leonard then opened the door and told Harms that he thought Primm was having a seizure. Leonard ran from the residence, stole a bicycle next door, and rode it to his vehicle parked farther up the street. Leonard jumped into his vehicle and sped from the scene.

As she described her injuries for the jury, Primm referred to photographs that were taken of her at the hospital immediately after the assault. These photographs were admitted into evidence. During her testimony, Primm admitted a previous addiction to heroin. Harms also admitted using marijuana with Primm.

Primm's neighbor, Kenneth Ferns, testified that he ran outside after he heard his son exclaim that someone had stolen his bicycle. Ferns saw Harms chasing Leonard from Primm's house. Harms yelled to Ferns that Primm had been severely beaten and directed him to call the police, which Ferns did. Primm then ran out of her house and collapsed on Ferns's front lawn. He described Primm's injuries as "[a]bsolutely horrible. She was . . . tied, bound, her mouth was gagged, she was . . . bleeding, her face was just beat." R. 15-8 Page ID 1026. Ferns was not only

2

concerned about Primm's condition, but horrified that his four children witnessed her injuries. Ferns disclosed on cross-examination that he had seen drug activity at Primm's home.

Joseph Claybaugh testified that Leonard jumped on his bicycle and rode it to his vehicle a block away. Claybaugh noticed Leonard was not wearing a shirt and he had blood on his face, but Claybaugh could not tell if Leonard was cut.

Dr. James Sweeney, a general surgeon, testified as a fact witness and medical expert for the prosecution. Dr. Sweeney did not provide direct medical care to Primm; rather, he supervised the surgical residents who treated her. Before testifying, he discussed Primm's treatment with the residents and reviewed her medical records. The prosecution did not offer Primm's medical records into evidence.

Although Primm stated she was in the hospital about four days, Dr. Sweeney clarified that her stay extended to eleven or twelve days. She suffered multiple fractures to the orbit of the right eye, upper jaw, and nose, which required three surgeries to realign the facial bones. She also had an upper arm fracture and lacerations. Dr. Sweeney gave his opinion that the facial fractures easily could have resulted in life-threatening brain injuries, such as subdural or epidural hematoma. On cross-examination he revealed that Primm did not have any skull fractures, stab wounds, or injuries to vital organs; laboratory testing detected opiates and benzodiazepines in Primm's blood, indicating likely heroin use; and her lacerations could have been caused by something other than a knife. Dr. Sweeney did not know that Primm lost eight teeth, but he was not surprised, considering the extent of her jaw injuries. He agreed that facial wounds tend to bleed a lot, but he did not know how much blood Primm lost.

Leonard was arrested four days after the assault. Detective Robert Ahrens testified that he interviewed Leonard after reading him the *Miranda* rights. According to Leonard, Primm introduced him to heroin and then demanded a supply of the drug as part of his rent. On the day of the assault, Primm wanted more heroin and alcohol, but he refused to provide it. She became enraged and attacked him. Detective Ahrens noticed that Leonard did not have any physical injuries. He showed Leonard a photograph of Primm's injuries and asked why she looked like she did when he was not injured. Leonard replied that she must bruise easily.

At trial, defense counsel cross-examined the prosecution's witnesses to bring out evidence favorable to Leonard, who waived his right to testify. Defense counsel did not call any witnesses because they would have offered cumulative testimony.

During trial Leonard complained to the court that his attorney did not provide him with various records he wanted used in his defense, including medical records, preliminary hearing transcripts, criminal history reports, and utility records. Leonard did not deny that Primm was injured, but he wanted his counsel to demonstrate that: he paid rent to Primm even though some of the utilities had been shut off; she demanded money, alcohol and drugs, which he provided; she started the incident by striking him in the head with an empty liquor bottle when he refused to give her any more drugs and money; the blow to his head explained why there was blood on his face; her conduct in striking him first allowed him to act in self-defense; Harms lied about whether the back door was open; both Primm and Harms gave prior inconsistent statements to the police and at the preliminary hearing; and medical records would show that Primm was not injured as severely as she claimed and she was using narcotics at the time of the assault, although she denied it.

4

The court reviewed the criminal history reports *in camera* and found nothing in them to impeach Primm or Harms. The court noted that it had allowed defense counsel, "an excellent attorney" who "did an excellent job," to go as far as the court would allow in bringing out the prior drug history of Primm and Harms. Defense counsel provided Leonard with the preliminary hearing transcripts, but the court did not allow Leonard to recall Primm or Harms to question them about inconsistencies in their testimony. Counsel explained that he deliberately did not use the police report because Harms told the police he did not confront Leonard because he saw a large pocketknife sticking out of his back pocket. However, counsel brought out other aspects of the police report that were favorable to Leonard when he cross-examined Detective Ahrens.

With regard to Primm's medical records, the court stated that any reports confirming Primm used narcotics were "absolutely relevant" and Leonard was "entitled to them." When Detective Ahrens told the court that he possessed only the discharge summary, the court directed him to make sure that Dr. Sweeney brought the entire medical file to court. The record does not indicate, however, whether Leonard and his counsel reviewed the medical records before Dr. Sweeney gave his testimony.

During closing argument, the prosecutor contended that the severity of the facial injuries Leonard inflicted by kicking and beating Primm over an extended period of time, combined with his express threats to kill her and his actual use of a knife to cut her, confirmed that he had the specific intent to kill. The prosecutor postulated that Primm would have been killed if Harms had not shown up. The defense attorney did not dispute that Leonard committed the assault. He maintained, however, that the evidence was insufficient to prove specific intent because Leonard had the means to kill available to him for two hours, yet he did not employ those means to commit murder.

5

The jury convicted Leonard as charged. The trial court imposed a sentence of imprisonment of eleven years and three months to twenty years.

On direct appeal, Leonard argued that the evidence was insufficient for conviction and trial counsel rendered ineffective assistance by failing to request jury instructions on lesser-included offenses and by failing to impeach Primm and Harms with their prior inconsistent statements. Under *People v. Ginther*, 212 N.W.2d 922 (Mich. 1973), counsel requested remand for an evidentiary hearing on the ineffective assistance claims. Not satisfied with appellate counsel's representation, Leonard submitted a *pro se* brief raising numerous additional claims, including that counsel was ineffective for failing to request discovery of Primm's medical records, which would have shown that Primm was untruthful about the extent of her injuries. Leonard also requested a *Ginther* hearing.

The Michigan Court of Appeals affirmed the conviction and sentence. *People v. Leonard*, No. 254492, 2005 WL 3556116 (Mich. Ct. App. Dec. 29, 2005) (per curiam). The court applied the standard applicable to ineffective assistance claims initially announced in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), *see Leonard*, 2005 WL 3556116, at *2 (citing *People v. Matuszak*, 687 N.W.2d 342, 352 (Mich. Ct. App. 2004)), and ruled that its appellate review was limited to the factual record presented because Leonard failed to move for a new trial or request an evidentiary hearing under *Ginther* in trial court. *Id.* (citing *People v. Armendarez*, 468 N.W.2d 893, 901 (Mich. Ct. App. 1991)). *See also Hargrave-Thomas v. Yukins*, 374 F.3d 383, 391 n.1 (6th Cir. 2004) ("Under *Ginther*, the Michigan Supreme Court requires a defendant on direct appeal to request an evidentiary hearing in the state trial court when it intends to raise ineffective assistance of counsel and lacks the factual support in the record."); *Ginther*, 212 N.W.2d at 925 ("To the extent his claim

6

depends on facts not of record, it is incumbent on him to make a testimonial record at the trial court level in connection with a motion for a new trial").

Based on the record presented, the court specifically addressed some of the ineffective assistance claims. *Leonard*, 2005 WL 3556116, at *3. But it rejected "other unmeritorious" claims—including Leonard's argument that trial counsel should have obtained Primm's medical records—on the grounds that the court was "loath" to second-guess trial counsel's strategic decisions and Leonard had not shown a reasonable probability that the outcome of his trial would have been different if his trial counsel had pursued a different strategy. *Id.*

On a related issue, the Michigan Court of Appeals agreed with Leonard that Dr. Sweeney's expert opinions were inadmissible hearsay under Michigan Rules of Evidence 703 because Primm's medical records were not admitted into evidence and the residents who treated her did not testify. *Id.* at *6. The court reviewed the matter for plain error, however, because Leonard did not object at trial. *Id.* The court observed:

> Indeed, defendant questioned Dr. Sweeney on the basis of the same impermissible evidence and established several facts in defendant's favor, including the existence of heroin in Primm's blood, a lack of injury to Primm's skull or vital organs, a lack of stab wounds, a lack of any indication that Primm lost an unusually large amount of blood, and the fact that the lacerations Primm received could have come from fingernails other than a knife. Furthermore, there was already considerable evidence that defendant inflicted substantial injury on Primm. Thus, although admission of the testimony constituted plain error because it was clearly inadmissible as a matter of law, the error did not "result[] in the conviction of an actually innocent defendant" or "'seriously affect[] the fairness, integrity or public reputation of judicial proceedings.'". . . Further, we do not believe this testimony was misleading under MRE 403.

*Id.* The Michigan Supreme Court denied Leonard's application for leave to appeal. *People v. Leonard*, 717 N.W.2d 887 (Mich. 2006).

7

In the federal habeas petition, Leonard asserted numerous claims. The district court denied the petition, *Leonard v. Wolfenbarger*, No. 07-10836, 2010 WL 1526466 (E.D. Mich. Apr. 16, 2010), but granted Leonard a certificate of appealability only on the claim that trial counsel was ineffective for failing to investigate Primm's medical records. *Leonard v. Wolfenbarger*, No. 07-10836, 2010 WL 2232248, *2 (E.D. Mich. June 2, 2010). This court declined to expand the certificate of appealability.

## II. STANDARD OF REVIEW

In a § 2254 habeas proceeding, we review the district court's legal conclusions de novo, applying the standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Moore v. Berghuis*, 700 F.3d 882, 886 (6th Cir. 2012). We may grant a habeas petition on a claim that was adjudicated on the merits in state court if the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) & (2). A state court decision amounts to an unreasonable application of clearly established federal law if it accurately identifies the governing legal rule but applies it in an unreasonable manner to the facts of the case before it. *Moore*, 700 F.3d at 886. Leonard must show that the state court's ruling on the claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786–87 (2011).

## III. ANALYSIS

The familiar rule by which courts measure ineffective assistance claims was set forth by the Supreme Court in *Strickland*, 466 U.S. at 687:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

Scrutiny of counsel's performance is highly deferential. *Id.* at 689. The reviewing court must try to eliminate "the distorting effects of hindsight," reconstruct the circumstances of the challenged conduct, and "evaluate the conduct from counsel's perspective." *Id.* Further, the court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.* A strategic choice made "after less than complete investigation [is] reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* at 690–91. This means that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691. A decision not to investigate "must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.*

The Michigan Court of Appeals rejected Leonard's claim that trial counsel should have investigated Primm's medical records because it was "loath" to second-guess counsel's strategic decision and because Leonard did not demonstrate a reasonable probability that the outcome of his

9

trial would have been different if his lawyer had pursued a different strategy. *Leonard*, 2005 WL 3556116, at *3. The district court agreed, noting that many of the facts Leonard believed could have been established through further investigation and discovery were in fact presented to the jury at trial, and Leonard merely speculated when he asserted that additional investigation into Primm's medical records would have disclosed less severe injuries. *Leonard*, 2010 WL 1526466, at *2–3. The district court concluded that, "even if defense counsel's performance was deficient based on his failure to conduct further investigation or obtain discovery, any deficiency did not prejudice [Leonard's] defense." *Id.* at *3.

We defer to the decision of the Michigan Court of Appeals that Leonard's trial counsel made a reasonable strategic decision when he did not conduct further investigation into Primm's medical records. Leonard did not deny that he assaulted Primm. Considering the severity of her facial injuries as documented in the photographs seen by the jury, defense counsel reasonably determined that Leonard's best chance for acquittal was to convince the jury that Leonard did not intend to kill Primm. Because the trial record clearly confirms that defense counsel pursued this theory from opening statement through closing argument, the record is sufficiently detailed that a *Ginther* hearing in state court was not necessary. *See Washington v. Renico*, 455 F.3d 722, 731 n.4 (6th Cir. 2006); *People v. Bero*, 425 N.W.2d 138, 142 (Mich. Ct. App. 1988) (reviewing claim without remand for evidentiary hearing where available record contains sufficient detail to permit the court to decide the issue); *People v. Johnson*, 373 N.W.2d 263, 266 (Mich. Ct. App. 1985) (same).

In support of the theory that Leonard did not intend to kill, defense counsel elicited factual testimony from Dr. Sweeney that Primm did not sustain skull fractures, stab wounds, or injuries to major organs, thereby demonstrating that her injuries were not necessarily life-threatening, even if

10

they were serious. By bringing out these facts through the doctor's own words, counsel impressed the point on the minds of the jurors more effectively than if he had resorted to complex medical records to make the same point. In addition to mitigating the severity of Primm's injuries, counsel also successfully informed the jury, again through Dr. Sweeney, that Primm arrived at the hospital with traces of heroin or some other opiate in her blood, thus calling her credibility into question. Through other witnesses, defense counsel drew a timeline indicating that Leonard had more than ample time to murder Primm if that was his ultimate plan, but he did not kill her.

The jury's decision to convict Leonard does not warrant an inference that defense counsel's performance fell outside the wide range of reasonable professional assistance. *See Strickland*, 466 U.S. at 689. Under the circumstances presented, Leonard failed to overcome the presumption that his lawyer's action was sound trial strategy. *Id.* He also failed to show that his counsel's performance prejudiced him—that is, "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Id.* We are not persuaded that Leonard met this standard because he offered nothing to show that Primm's medical records, if introduced into evidence, would have swayed the jury to acquit.

Finally, the district court did not abuse its discretion in denying Leonard an evidentiary hearing on his ineffective assistance claim. We are "limited to the record that was before the state court that adjudicated the claim on the merits." *Robinson v. Howes*, 663 F.3d 819, 823 (6th Cir. 2011).

## IV. CONCLUSION

For these reasons, Leonard is not entitled to federal habeas relief. The state court's adjudication of the claim did not result "in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Moore*, 700 F.3d at 886. Accordingly, we AFFIRM.